# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**GRETA M. HARLAN,**

      Plaintiff,

vs.                                                                     Civ. No. 04-1426 JH/ACT

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

      Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

      **THIS MATTER** comes before the Court upon Plaintiff's Motion to Reverse or Remand Administrative Agency Procedure, filed June 9, 2004. *Docket No. 14*. The Commissioner of Social Security issued a final decision denying benefits finding that Plaintiff was not disabled. Having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, the Court recommends that Plaintiff's Motion be denied.

## PROPOSED FINDINGS

### I. PROCEDURAL RECORD

      Plaintiff, Greta M. Harlan, applied for Disability Insurance Benefits and Supplemental Security Income Benefits on or about January 15, 2003. Tr. 53, 199. Plaintiff alleged she became disabled on November 1, 2001, due to depression and difficulties in being able to leave her house.[1] Tr. 67, 155. Plaintiff stated that her conditions first bothered her in January 1998, and that she stopped

---

[1] During medical evaluation and treatment, Plaintiff received diagnoses of post traumatic stress syndrome ("PTSD"), major depression, and generalized anxiety. *See, e.g.,* Tr. 161-63, 178, 189-191.

working as of November 1, 2001,[2] both because of depression and personal problems, including her father's death. Tr. 67. Plaintiff's benefits' applications were denied at the initial and reconsideration level.

The Administrative Law Judge ("ALJ") conducted a hearing on June 30, 2004. At the hearing, the Plaintiff was represented by her attorney. On July 30, 2004, the ALJ issued his decision, finding that Plaintiff had PTSD and major depression which were severe but not disabling. Tr. 17, 21. Thereafter, the Plaintiff filed a request for review. On October 28, 2004, the Appeals Council issued its decision denying Plaintiff's request for review and upholding the final decision of the ALJ. Tr. 7. The Plaintiff subsequently filed her Complaint for court review of the ALJ's decision on December 27, 2004. *Docket No. 1.*

Plaintiff was born on August 14, 1973. Tr. 53. She was thirty years old at the time of the administrative law hearing. She worked for the City of Albuquerque for approximately ten years. She last worked at the County Library System from April 3, 1995 through November 14, 2000. Tr. 115. Plaintiff has a high school education and some college course work. Her past relevant work was childcare provider, information clerk, library specialist and claims representative. Tr. 68. She lives with her young twin sons and her mother.

## II. STANDARD OF REVIEW

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *See Hamilton v. Secretary of Health and Human Services*, 961 F.2d 1495, 1497-98 (10th Cir. 1992); *Glenn v. Shalala*, 21 F.3d 983 (10th Cir. 1994). To be substantial, evidence must be relevant and

---

[2]According to her employer, Plaintiff stopped working on November 14, 2000. Tr. 115.

sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992); *Sisco v. United States Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (1993). A decision of an ALJ is not supported by substantial evidence if other evidence in the record overwhelms the evidence supporting the decision. *See Gossett v. Bowen,* 862 F.2d 802, 805 (10th Cir. 1988).

In order to qualify for disability insurance benefits, a clamant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520(a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *See Thompson,* 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In this case, the ALJ determined at step five that Plaintiff was not disabled and that she could perform other work available in the national economy.

### III.  MEDICAL HISTORY

The medical records include the following:  an initial screening assessment on June 4, 1999, treatment notes of Plaintiff's treating psychologist, Lawrence Harris, Ph.D., and Plaintiff's treating psychiatrist, Gary Borrell, M.D. from 2002 to 2004, a Psychiatric Review Technique Form completed by a non-examining psychiatrist on April 14, 2003, and a mental skills assessment form filled out by Dr. Harris in September 2003.

In 1999, Plaintiff's employer, City of Albuquerque, referred her to the Mental Health Center of Lovelace Health Systems.  The Lovelace June 4, 1999 Initial Screening Assessment was prepared by Monica Zmuda, R.N., and at least one page of the Assessment is not in the record.  The form indicates that Plaintiff reported "recent suicidal ideation" and that she had been on Paxil for five months.  Tr. 134.  Follow-up appointments were made to see a physician and an individual for counseling in 1999.  Tr. 135.  There are no reports from follow-up appointments in the record and no further medical records until late 2002.

In October 2002, Dr. Harris, Ph.D., Plaintiff's treating psychologist, performed an Initial Assessment.  Plaintiff said she was referred by her primary care physician, Dr. Greenberg, because of depression and rapid mood changes.  Tr. 130.  She had no history of counseling or psychiatric hospitalizations.  Dr. Harris performed a mental status examination.  He found that Plaintiff was alert, responsive and cooperative.  Tr. 131.  She was oriented and her short and long term memory were intact.  He found that her thought processes were logical, coherent, and goal-directed, and that her

impulse control and judgment were within normal limits. *Id*. Dr. Harris diagnosed Plaintiff with major depression and found that her Global Assessment of Functioning ("GAF") was "50/60." Tr. 132.

In November 2002, Dr. Harris noted that Plaintiff was bouncing off the walls. Plaintiff described herself as "zoning off." She was not thinking about anything, and it was hard to function day-by-day. She was unable to focus. Tr. 128.

In January 2003, Plaintiff saw Robert Denton, M.D. Plaintiff told him that she was often angry and uncomfortable when around others. Tr. 123. Her affect was "labile with the frequent expressions of agitation, anxiety and anger." In the examination, Dr. Denton found that Plaintiff's thought processes were "for the most part rational and logical and goal oriented." Tr. 123-24. She discussed one incidence of sexual abuse that occurred when she was about 8 and another instance of sexual intrusiveness in her teens. Dr. Denton diagnosed Plaintiff with PTSD and prescribed Valium. Tr. 125-26.

In January 2003, Plaintiff also saw Dr. Harris. He noted that Plaintiff complained of "running on adrenalin" and being exhausted by 7 p.m. She was "emotionally labile and brittle." In February 2003, Dr. Harris reported that Plaintiff was still complaining of anxiety and feelings of being overwhelmed. She had been taking Paxil but found it ineffective. She had been switched to Prozac. Tr. 121. On February 4, 2003, Dr. Harris observed that she spoke with "somewhat pressured speech." As of that date, she was taking Valium for anxiety, Prozac and Neurontin. Tr. 122.

In March 2003, Plaintiff reported to Gary Borrell, M.D., her treating psychiatrist, that she was easily distracted and startled. Tr. 165. She also said she spent most of her day at home and found it "hard to deal with people." Tr. 165. Dr. Borrell performed a mental status exam and found that Plaintiff was alert, cooperative and had good eye contact. Tr. 166. He observed that Plaintiff's

laughter seemed anxious but that she was also coherent, logical, relevant and goal-directed. *Id*. He found no disorders of Plaintiff's thought processes. He further noted that Plaintiff was "well oriented in all spheres, demonstrating an intact recent and remote memory." Tr. 167. In March 2003, Dr. Harris recorded that Plaintiff described suicidal ideation but stated she would not harm herself because of her sons. Tr. 164.

A non-examining physician reviewed Plaintiff's medical records on or about April 13, 2003. The state agency physician found that Plaintiff had mild restrictions on her daily living activities and ability to concentrate. Tr. 147. The physician also found that Plaintiff had moderate limitations on her social functioning. The physician further indicated that there was insufficient evidence to address any episodes of decompensation. Tr. 147. He concluded that the evidence showed Plaintiff had limitations related to working with others or with the general public. Tr. 152. However, the physician also found that Plaintiff's impairment "does not appear to be consistent with available clinical and lay evidence." Tr. 153.

Later in April 2003, Plaintiff saw Dr. Borrell again. Plaintiff was upset over the recent hospitalization of her paternal grandfather and death of her paternal aunt. Tr. 161. Dr. Borrell found that Plaintiff was alert, cooperative and that her speech was coherent and goal-directed. Tr. 163. Plaintiff did not appear to have a thought disorder. Her affect was bright and animated, and she seemed well-oriented.

Plaintiff saw Dr. Harris several times between April and the end of June 2003. Dr. Harris found her tearful, isolated, anxious and depressed. Tr. 160. She continued to avoid people and isolate herself by staying at home. Tr. 159. She continued to report chronic fatigue and lack of interest or motivation in June 2003. Tr. 158. She had gone to court about child support but still had

to depend on her mother. She reported lability, anger, and depression. Tr. 158. As of June 30, 2003, Dr. Harris' notes seem to indicate that Plaintiff was taking a class at TVI. Tr. 157.

In August 2003, Plaintiff told Dr. Borrell that she was stressed and getting very little sleep without medication. Tr. 180-81. She complained that her mind would not let her tap into "anything I know." Again, Dr. Borrell observed that Plaintiff was alert and cooperative and that her speech was coherent and goal-directed, demonstrating no disorder of thought progression. Tr. 181. Dr. Borrell noted that Plaintiff bounced her leg on the carpet during the interview and her hands were almost constantly in motion. He found that "her affect demonstrated a significant level of anxiety." Id. He diagnosed her with PTSD and generalized anxiety disorder. Tr. 182.

On September 10, 2003, Dr. Harris filled out a Mental Impairment Questionnaire. Tr. 168. He assigned Plaintiff a GAF of 55. However, he stated that Plaintiff was unable to hold a job even though she was motivated to do so. He noted "isolative suicidal ideation, emot. lability, anxiety." Tr. 169. Plaintiff was receiving outpatient therapy, was on "minimal medication," and there was "some stabilization." Tr. 169. Her prognosis was "guarded." Dr. Harris noted that Plaintiff did not have a low I.Q. or reduced intellectual functioning. In the checklist portion of the questionnaire, Dr. Harris found "poor or no" abilities in 8 of 16 categories related to Plaintiff's mental abilities and aptitude needed to do unskilled work. He justified those findings by stating that "pt's level of anxiety, over-reactivity, mood lability and poor concentration severely impacts functioning at work and in home setting." Tr. 172. Dr. Harris also found that Plaintiff had slight limitations as to restrictions of activities of daily living, moderate limitations in maintaining social functioning, frequent difficulties in maintaining concentration and repeated episodes of decompensation, each of extended duration. Tr. 173.

7

In December 2003, Dr. Borrell noted that Plaintiff had completed an Adult Intensive Outpatient Program. Tr. 176. Plaintiff told Dr. Borrell that the program was "quite helpful and useful to her." Id. She also reported that she was still having problems leaving the house. Tr. 177. Dr. Borrell found that the program had helped Plaintiff and that there was "improvement in her mood." Tr. 177.

Dr. Harris saw Plaintiff in December 2003. Plaintiff was still staying at home. She discussed being sexually molested. However, the record is virtually illegible. Tr. 198. In a March 2004 record, Dr. Harris wrote that patient was "well defended but defenses not adequate." His progress notes for this period are generally illegible. Tr. 192-98.

In April 2004, Dr. Borrell recommended that Plaintiff continue on her medications of Prozac and Neurontin. Tr. 180. He stated that Plaintiff bounced her leg on the floor and at times was wringing her hands which he found "distinctly different from previous clinical presentations during interviews." Tr. 184-85. Yet, Dr. Borrell's August 2003 notes record the same type of behavior.. In June 2004, Dr. Borrell saw Plaintiff again. His findings were similar to those stated above. However, he increased her prescription of Zyprexa to help with her "profound depression." Tr. 190.

By way of summary, Plaintiff's first medical record in the administrative record (Lovelace initial screening assessment) is dated June 4, 1999. There are no other medical records until late 2002. Work records indicate her last day of work was in mid-November 2000. The onset date of her disability was November 1, 2001. Plaintiff applied for social security benefits in January 2003. Her administrative law hearing took place on June 20, 2004, and the ALJ issued his decision on July 30, 2004.

## IV. DISCUSSION

Plaintiff claims that the ALJ erred in at least three ways. First, she contends that the ALJ improperly determined that her mental impairments did not meet or equal listings at step three of the sequential analysis. Second, she asserts that the ALJ failed to give controlling weight to the opinions of her treating psychiatrist and psychologist. Third, she argues that the ALJ's hypothetical question to the vocational expert failed to properly consider her limitations as reported by her treating psychologist and psychiatrist. She alleges that the ALJ improperly ignored the VE's testimony which supported a finding that Plaintiff was unable to perform unskilled work due to her nonexertional limitations.

The government asserts that the commissioner's finding of non-disability was consistent with the pertinent regulatory criteria and that the ALJ properly concluded that Plaintiff could perform work available in the national economy. The government further contends that the ALJ's decision was supported by substantial evidence and represented a correct application of the regulations.

### A. Step Three Listing Analysis

A claimant has the burden of proving that her condition meets or equals a Listing for purposes of the step three analysis. *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885, 891-92 (1990). In order to satisfy that burden, the claimant must demonstrate that her impairment meets or equals all of the specified medical criteria for the Listing in question. If the impairment meets only some of the criteria, regardless of severity, a Listing will not be met. *Id.*, 110 S.Ct. at 891.

At step three, the ALJ must determine whether the "medical findings" are at least equal in severity and duration as those criteria set forth in a Listing. *Bernal v. Bowen*, 851 F.2d 297, 300 (10th Cir. 1988). "'Medical findings' include symptoms (claimant's own description of his impairments), signs (observations of anatomical, physiological and psychological abnormalities which

are shown by clinical diagnostic techniques) and laboratory findings." *Id.* (*citing* 20 C.F.R. §§ 404.1526(a); 404.1528(a)). The claimant's descriptions, alone, are insufficient to establish the criteria of a Listing. *Id.* The step three analysis requires a comparison of those medical findings and evidence with the Listing criteria.

Under 42 U.S.C. § 405(b)(1), the ALJ is "required to discuss the evidence and explain why he found that the appellant was not disabled at step three." *Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996). "In the absence of ALJ findings supported by specific weighing of the evidence, we cannot assess whether relevant evidence adequately supports the ALJ's conclusion that appellant's impairments did not meet or equal any Listed Impairment, and whether he applied the correct legal standards to arrive at the conclusion." *Id.*

Here, the ALJ discussed the pertinent medical records and Plaintiff's diagnoses. Tr. 17. He concluded that Plaintiff's PTSD and depression were severe impairments at step two of the evaluation, but not "severe" enough to meet or medically equal, singly or in combination, the listing requirements at step three. In so finding, the ALJ noted that Plaintiff's treating psychiatrist indicated Plaintiff had frequent difficulties in maintaining concentration, persistence or pace and repeated (3 or more) episodes of decompensation. Yet, the ALJ correctly observed that there was little to no objective medical evidence during this time frame to support Dr. Harris' conclusion.

Dr. Harris presented his conclusion regarding Plaintiff's ability to concentrate in a form, dated September 10, 2003. However, as observed by the ALJ, the earlier 2003 medical records do not indicate that Plaintiff complained of a serious problem with her concentration, or that Dr. Harris made objective findings that Plaintiff was unable to concentrate. *See, e.g.,* Tr. 157-167, 180-82. During early to mid-2003, Plaintiff primarily complained of anxiety, fearfulness, lack of interest/motivation,

10

depression and stress to Dr. Harris. In March 2003, Dr. Borrell observed that Plaintiff demonstrated an "intact recent and remote memory." In April 2003, she appeared "well oriented in all spheres."

Consistent with these medical records is the non-examining physician's evaluation in April 2003 that Plaintiff's ability for sustained concentration and persistence generally was "not significantly limited" and moderately limited in only one of eight categories – the ability to maintain attention and concentration for extended periods. Tr. 151. It is true that in late August 2003, Plaintiff complained that her mind would not let her tap into anything that she knew. Dr. Borrell, however, did not report any significant or direct complaints by Plaintiff that she was unable to concentrate, nor did he record any objective finding that Plaintiff was "markedly" impaired in her ability to concentrate.

The Court concludes that there is substantial evidence to support the ALJ's decision to discount Dr. Harris's finding that Plaintiff experienced "frequent" difficulties in maintaining concentration and also to disregard Dr. Harris' conclusion that she suffered repeated episodes of decompensation.[3] In addition, substantial evidence supports the ALJ's finding that Plaintiff failed to establish that she had the required "marked" limitations necessary to satisfy the "B" and "C" criteria for the pertinent listings. Indeed, Plaintiff failed to discuss the specific "B" and "C" criteria or what evidence supported findings of "marked" limitations in any category. Instead, she made cursory arguments that the ALJ failed to consider all of the evidence or did not have all of the necessary

---

[3]There are no medical records indicating Plaintiff suffered repeated episodes of decompensation prior to Dr. Harris' completion of the form. There are records indicating that Plaintiff felt she had urges to be violent but she stated she was able to control those urges. She also was aware of having aggressive feelings, yet nothing in the record indicates she acted aggressively. *See, e.g.,* Tr. 133, 163.

evidence. Plaintiff's conclusory and unsubstantiated arguments fail to meet her burden at step 3 of the sequential process.

### B. Treating Physician rule

Typically, "the Commissioner will give more weight to medical opinions from treating sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Before deciding how much weight to assign to a treating physician's medical opinion, the ALJ must determine whether the opinion qualifies for "controlling weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). "An ALJ is required to give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." *Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir. 2001) (*citing* 20 C.F.R. § 416.927(d)(2)). The Tenth Circuit, in *Watkins*, stated that controlling weight is assigned to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and it is "consistent with other substantial evidence in the record." *Watkins,* 350 F.3d at 1300; *see also Castellano v. Sec'y of Health & Human Services*, 26 F.3d 1027, 1029 (10th Cir. 1994) (same). If the treating physician's opinion fails in either regard, it is not entitled to controlling weight. *Watkins*, 350 F.3d at 1300. Moreover, a treating physician's opinion may be rejected "if it is brief, conclusory, and unsupported by medical evidence." *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).

A treating physician's opinion is still entitled to deference even if not assigned controlling weight. 20 C.F.R. § 404.1527, § 416.927. If an ALJ rejects or discounts a treating physician's opinion, the judge must set forth "specific, legitimate reasons" for doing so. *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984). In such instances, the ALJ must not make speculative inferences

from medical reports. *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002). An ALJ may not reject a treating physician's opinion outright based on the judge's own credibility judgments, speculation, or lay opinion. *Id.*

In determining the appropriate weight owed to a treating physician's opinion, the Tenth Circuit has outlined the following factors to consider: (1) length of treatment relationship and frequency of examination; (2) nature and extent of treatment relationship, including treatment provided and examinations that were performed; (3) degree to which the opinion is supported by relevant evidence; (4) consistency between the opinion and record as a whole; (5) area of specialty of the treating physician in relation to the opinion given; and (6) other factors brought to the ALJ's attention that may or may not support the opinion. *Watkins*, 350 F.3d at 1301; *Goatcher v. United States Dep't of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995); 20 C.F.R. § 404.1527(d)(2)-(6).

Plaintiff states summarily that the ALJ erred in failing to give controlling weight to the opinions of the treating psychiatrist and psychologist, yet her opening brief does not identify either the physician or the actual opinions that the ALJ purportedly failed to properly consider. *Docket No. 15,* pp. 16-18. For example, Plaintiff states that the doctors' "clinical notes in the record clearly support their opinions entirely." It is unclear from Plaintiff's brief which physicians' opinions she believes were erroneously disregarded, or which "clinical notes" actually contained opinions. Thus, it is difficult for the Court to analyze Plaintiff's arguments.[4]

---

[4]Plaintiff's reply brief is not of much assistance in this regard. In the reply, for example, Plaintiff argues that the ALJ erred by not referring to the report of Plaintiff's previous employer who opined that Plaintiff had difficulty concentrating at work. An ALJ is not required to discuss every document in the record. *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir.1996) ("The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.")

The Court can only assume that Plaintiff is challenging the ALJ's failure to give controlling weight to the questionnaire form filled out by Dr. Harris in September 2003. To the extent that Plaintiff relies on Dr. Harris' progress notes, the Court again observes that they are difficult to read, are not helpful in terms of providing objective medical evidence and do not appear to provide medical opinions. Instead, they merely document Plaintiff's subjective complaints and Dr. Harris' impressions on certain days.

In his decision, the ALJ discussed why he discounted Dr. Harris' opinions that the claimant had frequent difficulties in maintaining concentration, persistence or pace and that she had repeated episodes of decompensation, each of extended duration. Tr. 17. *See* discussion *supra.* In so doing, the ALJ clearly stated why he concluded that Dr. Harris' opinion was not supported by the objective medical record, "including [Dr. Harris'] own clinical notes." The ALJ also rejected Dr. Harris' opinion that Plaintiff had a current history (for one or more years) of inability to function outside a highly supportive living arrangement. The ALJ explained that Plaintiff did not live in a highly supportive living arrangement like a halfway house. For the stated reasons, the ALJ gave no weight to this assessment by Dr. Harris. Tr. 17.

To the extent these are the opinions that Plaintiff contends were erroneously disregarded, substantial evidence supports the ALJ's determination that they were not entitled to controlling weight. Nothing in the record indicates that Dr. Harris' opinions were "well-supported by medically acceptable clinical and laboratory diagnostic techniques." Moreover, the ALJ gave specific reasons for disregarding or discounting these opinions.

Plaintiff may be relying on other portions of the September 2003 questionnaire filled out by Dr. Harris. In the form questionnaire, Dr. Harris stated: "Pt unable to hold job though motivated to

14

do so, isolative suicidal ideation, emot. lability, anxiety." The questionnaire asked the physician how often, on average, he anticipated his patient's impairments would cause her to be absent from work. Dr. Harris did not answer the question, but simply wrote: "pt not employed." On the part of the questionnaire that contains boxes to check off, Dr. Harris checked a number of boxes indicating "poor or none" in response to Plaintiff's mental abilities and aptitude needed to do unskilled work. At the end of the section, he wrote "Pts level of anxiety, over-reactivity, mood lability and poor concentration severely impacts functioning at work and in home setting." Tr. 172. In the part of the form that asked Dr. Harris to assess Plaintiff's mental abilities and aptitudes needed to do particular types of work, he checked poor or none in several categories, and good and fair in several other categories. Tr. 172.

The Court does not know which of these "opinions" or checked-off boxes Plaintiff believes were entitled to controlling weight. The ALJ did not discuss every portion of the form, nor is he required to do so. *Clifton*, 79 F.3d at 1009-10 (10th Cir.1996) (an ALJ is not required to discuss every piece of evidence). While the Court is mindful that it is not to supply possible reasons for giving less weight to or rejecting a treating physician's opinion, *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004), the form questionnaire simply does not set out objective medical evidence in support of Plaintiff's application for benefits. *See Smith v. Barnhart*, 35 Fed. Appx. 805, 808 (10th Cir. May 22, 2002) (ALJ properly rejected treating physician's opinion found in a form requiring the doctor to merely check boxes, when the form was not accompanied by a written report or testimony). Dr. Harris' checked off boxes and scribbled remarks are more akin to the type of "brief, conclusory, and unsupported" opinions that can be properly rejected. He provided minimal explanation as to why he checked the boxes he did on the questionnaire and no accompanying report to explain his findings.

15

His progress notes are sketchy and lack sufficient detail to support the findings (check-off boxes) contained in the questionnaire. The Court also observes that there is no evidence in the record to show that Dr. Harris conducted any type of psychological testing of Plaintiff.

In addition, Plaintiff argues that "[t]he ALJ should have contacted the psychologist for clarification of his opinion before rejecting it." Again, Plaintiff fails to identify the opinion that may have required clarification. Moreover, Plaintiff's discussion and summaries of various social security cases are unhelpful as she failed to connect those cases to the specific facts of her case.

The Court concludes that, to the extent it can identify which opinions Plaintiff challenges, substantial weight supports the ALJ's decision to discount or reject those opinions.

### C.    **HYPOTHETICAL TO VOCATIONAL EXPERT**

In the ALJ's decision, he discussed at length Plaintiff's testimony about what she was able to do on a day-to-day basis, including her abilities to care for her two children, drive and take her children to school, attend church, go to movies, perform housework, and care for her own hygiene. The ALJ also noted that Plaintiff began to have difficulties when her father died in 1999, started to withdraw and isolate herself then and continued to do so, felt angry and suicidal on a daily basis, had trouble sleeping, and took medications to control her emotional problems without side effects. Tr. 18. In addition, the ALJ observed that Plaintiff had no exertional or physical limitations. At step four of the sequential process, the ALJ concluded that Plaintiff retained the residual functional capacity ("RFC") to perform simple, routine, unskilled, non-public work.

In deciding that Plaintiff did not have the RFC to perform her past relevant work, the ALJ relied on the VE's testimony and the non-treating doctor's review of Plaintiff's medical records. The non-treating doctor concluded that Plaintiff had moderate difficulties with social functioning and in

concentrating but was not significantly limited in her abilities to remember locations and work-like procedures, understand and remember very short and simple, as well as detailed instructions, carry out very short and simple, as well as detailed instructions, perform activities within a schedule, sustain an ordinary routine without special supervision, make simple work-related decisions, and complete a normal work-day and workweek without interruptions from psychologically based symptoms. Tr. 18, 151-52.

At this point, the ALJ properly noted that the burden shifted to the Social Security Administration to show that there were other jobs existing in significant numbers in the national economy that Plaintiff could perform with her RFC. Tr. 19. The ALJ also observed that the Medical-Vocational Rules did not direct conclusions of disabled or non-disabled in this case. Thus, he relied on an impartial VE's testimony to help make the determination.

At the hearing, the ALJ presented a hypothetical to the VE that assumed no physical limitations but provided that Plaintiff required a nonpublic job that was simple and routine, with "one or two step processes" and that was unskilled. Tr. 252. Initially, the VE responded that she did not believe there would be any other work Plaintiff could do. Tr. 252. The ALJ commented that he could not believe there would be no other work. The VE clarified what the ALJ meant by nonpublic work and proceeded to testify that there were positions Plaintiff could perform in the national economy, such as labor polisher, jewelry preparer and clerical addresser. Tr. 252-53.

Plaintiff argues that the hypothetical question failed to properly consider her limitations that essentially were set out by Dr. Harris in 0the form questionnaire filled out in September 2003. The Court has already discussed at length why the ALJ properly discounted and/or disregarded Dr.

17

Harris' opinions in the form questionnaire.[5] *See* discussion *supra*. Moreover, to the extent that the ALJ's hypothetical relied upon the non-treating doctor's assessment of Plaintiff's limitations, the Court finds substantial evidence in the medical records to support the non-treating doctor's conclusions. For example, the non-treating physician would have had Dr. Harris' initial October 2002 assessment of Plaintiff available for review, in which Dr. Harris assigned Plaintiff a GAF of 50/60. Tr. 132. [*See* discussion of GAF range of 51-60 at n. 5.]

The Court finds that the ALJ did include in his hypothetical those restrictions that were substantiated by the objective medical evidence, including the non-treating physician's evaluation, as well as objective impressions contained in the treating doctor's progress notes. *See Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) (hypothetical questions to the VE need only reflect impairments and limitations that are borne out by the evidentiary record). Here, the VE identified some jobs that Plaintiff could perform. Thus, the Court concludes that the VE's testimony provides substantial evidence to support the ALJ's decision.

## RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse or Remand be DENIED and that the case be DISMISSED, with prejudice.

Timely objections to the foregoing may be made pursuant to 28 U.S.C. § 636(b)(1)(C). Within 10 (ten) days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to § 636(b)(1)(C), file written objections to such proposed

---

[5] While not discussed by the ALJ, in the September 2003 questionnaire, Dr. Harris assigned a GAF of 55 for Plaintiff. A GAF rating between 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 1994) (DSM-IV).

findings and recommendations with the Clerk of the United States District Court, 333 Lomas N.W., Albuquerque, NM 87102.  A party must file any objections within the 10 (ten) day period allowed if that party wants to have appellate review of the proposed findings and recommendations.  If no objections are filed, no appellate review will be allowed.

_____
**ALAN C. TORGERSON**
**UNITED STATES MAGISTRATE JUDGE**